24065

Ernest M. RIDDLE, Petitioner v. STATE of South Carolina, Respondent.

(443 S.E. (2d) 557)

Supreme Court

*Daniel T. Stacey, Chief Atty., S.C. Appellate Defense,* Columbia, *for petitioner.*

*T. Travis Medlock, Atty. Gen., Donald J. Zelenka, Chief Deputy Atty. Gen., Harold M. Coombs, Jr., Sr. Asst. Atty.*

*Gen., William Edgar Salter, III, Asst. Atty. Gen.,* Columbia, and *Holman C. Gossett, Sol.,* Spartanburg, *for respondent.*

Heard Sept. 21, 1993.

Decided May 9, 1994. Reh. Den. June 7, 1994.

TOAL, Justice:

Petitioner appeals a third jury's recommendation that a sentence of death be imposed for Petitioner's previous convictions of murder, armed robbery, and burglary. We consolidate the mandatory sentencing review with this appeal and affirm.

## FACTS

Petitioner was indicted at the November 1985 term of the Cherokee County Court of General Sessions for the crimes of murder, burglary in the first degree, and armed robbery. All of these charges stemmed from the brutal murder of Ms. Abbie Sue Mullinax, a 76-year-old widow who lived with her stepdaughter in Gaffney, South Carolina.

Petitioner was tried, convicted, and sentenced to death. The original sentencing jury found that the murder was committed while in the commission of burglary and while in the commission of robbery while armed with a deadly weapon. On appeal, we affirmed Petitioner's convictions but remanded for a new sentencing hearing. *State v. Riddle,* 291 S.C. 232, 353 S.E. (2d) 138 (1987) (remanded where trial court improperly excluded evidence of adaptability to prison life, and for admission of defendant's juvenile record at trial without notice to the defendant) (hereinafter *Riddle I*).

The case was called for resentencing on September 28, 1987, in the Cherokee County Court of General Sessions before a different judge and jury. On October 1, 1987, the second resentencing jury also recommended that Petitioner receive the death penalty. On appeal, we reversed and remanded for resentencing because the trial court erred in admitting the Petitioner's previous convictions at the first trial as proof of the aggravating circumstances at the subsequent resentencing proceeding. *State v. Riddle,* 301 S.C. 68, 389 S.E. (2d) 665 (1990) (hereinafter *Riddle II*).

Following pretrial motions hearing on August 28 and November 13, 1992, the trial judge, who presided at the first

trial, agreed to impanel a jury from Newberry County pursuant to S.C. Code Ann. § 17-21-85 (Supp. 1991). Thereafter, a resentencing hearing was held and a third jury found that the murder was committed while in the commission of a robbery while armed with a deadly weapon, and while in the commission of burglary. As a result, this third jury recommended that Petitioner be sentenced to death. The trial judge, finding that the recommendation was not the result of passion, prejudice, or other arbitrary factors, imposed the death sentence.

This appeal consolidates Petitioner's appeal and the mandatory review of the death sentence as required by S.C. Code Ann. § 16-3-25 (1987).

## ISSUES

The Petitioner raises the following six issues on appeal:

1. Is the Petitioner's death sentence barred by the double jeopardy prohibitions of the United States and South Carolina Constitutions?

2. Did the trial court err when if first declared the co-defendant brother of the Petitioner to be a court's witness and then declared him to be unavailable upon his refusal to testify, thereby allowing his previous sworn testimony in the guilt phase of *Riddle I* to be read to the jury?

3. Was the victim impact evidence admitted at trial more prejudicial than probative?

4. Did the trial judge err in disqualifying a venireman for cause when the potential juror's beliefs on capital punishment would have prevented her from giving the death sentence?

5. Did the trial judge err in accepting the State's explanations for peremptory strikes of two potential black jurors?

6. Did the trial judge err in admitting a photograph of the victim taken at the crime scene?

## LAW/ANALYSIS

1. Double Jeopardy

Petitioner asserts that our decision in *Riddle II* was in effect an "acquittal" from consideration of the death penalty. Petitioner bases his argument on the language of the concurring opinion, which contended that no evidence was submitted to the jury to support the aggravating circum-

stances. *Id.* Petitioner posits that since the concurrence found "no evidence" and because the majority did not refute this statement, then as a matter of law, it acts to prevent reconsideration of the death penalty.

In *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed. (2d) 1 (1978), the Supreme Court held that double jeopardy precludes a second trial where a reviewing court has found the evidence legally insufficient in the first trial. *Id.* In *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed. (2d) 265 (1988), the Supreme Court held that, "where the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial." *Id.* at 34, 109 S.Ct. at 287, 102 L.Ed. (2d) at 269-70. The Supreme Court noted the fundamental difference between a reversal based on the insufficiency of evidence and a reversal predicated on trial error in the admission of evidence. *Id.* Where the evidence was erroneously admitted, the Double Jeopardy Clause does not act to bar a retrial for sentencing. *Id.*

The relevant question here is whether the holding in *Riddle II* was predicated on the insufficiency of the evidence or a trial error in the admission of evidence.

In *Riddle II*, petitioner assigned trial court error in the admission of the jury's verdict in *Riddle I* of guilty of armed robbery and of burglary. He characterized this error as one of admission of evidence coupled with the trial court's failure to charge the elements of the crimes of armed robbery and burglary. It was petitioner's contention in *Riddle II* that these errors prevented the jury from exercising independent judgment regarding the aggravating circumstances. In effect, petitioner argued that these errors of admission of improper evidence and failure to charge resulted in an automatic verdict of guilty of the aggravating circumstances. Petitioner did not argue failure of proof in *Riddle II*.

In *Riddle II*, we found error in the admission into evidence of the indictments and verdict forms for armed robbery and burglary from the first trial, *Riddle I*, as proof of the aggravating circumstances in the subsequent resentencing trial. *Id.* The concurring opinion noted the question should focus on the inquiry of whether the murder was committed "while in the

commission of" the aggravating crimes. The concurrence contended, "this case must be reversed because of the lack of evidence to support the jury's finding that the murder was committed 'while in the commission of' the robbery and/or burglary." *Id.* 301 S.C. at 74, 389 S.E. (2d) at 668.

The concurring opinion points to an insufficiency of the evidence; however, the majority keys on the introduction of evidence by finding the indictments and verdict forms were not the *type* of evidence allowed for establishing aggravating circumstances. The previous indictments and verdict forms were evidence, albeit inadmissible evidence, that the aggravating circumstances were committed. The concurring opinion in *Riddle II* must be read in perspective. The majority opinion, which is the law of the case, focused on the admission of the convictions as proof of the aggravating circumstances, while the lone concurring Justice posited that this evidence was insufficient to satisfy the necessary "while in the commission of" test. Simply stated, the four-Justice majority in *Riddle II* dealt with a trial error in the admission of evidence and not the sufficiency of evidence as a matter of law.

In *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed. (2d) 123 (1986), the Supreme Court recognized the dangers inherent to an appellate court's "acquittal" when the majority wrote:

the Double Jeopardy Clause does not require the reviewing court, if it sustains [a claim that the evidence presented is insufficient as a matter of law], to ignore evidence in the record supporting another aggravating circumstance which the sentencer has erroneously rejected. Such a rule would have the odd and unacceptable result of requiring a reviewing court to enter a death penalty "acquittal" even though that court is of the view that the State has "proved its case." Our decisions in *Burks* and *Bullington* do not support such a rule, which would certainly give the prosecution cause to "complain of prejudice."

*Id.* at 157, 106 S.Ct. at 1756, 90 L.Ed. (2d) at 133.

The majority opinion in *Riddle II* and *Poland, supra,* when read in conjunction with the record before us, provides ample support for the finding of a trial error in the admission of evi-

dence rather than the insufficiency of evidence as a matter of law. Thus, the trial judge in *Riddle III* properly denied petitioner's motion to quash notice of death penalty finding that this retrial does not violate double jeopardy. Accordingly, we affirm on this issue.

## 2. Court's Witness, Unavailability, and Admission of Prior Testimony

### a. Court's Witness

Petitioner asks us to assign error where the trial court declared the co-defendant brother of the Petitioner to be a court's witness, then declared him to be unavailable upon his refusal to testify, thereby allowing his previous sworn testimony in the guilt phase of *Riddle I* to be read to jury.[1]

The seminal case in South Carolina outlining the test to be used in deciding when it is appropriate for a trial court to declare a witness as a court's witness is *State v. Anderson,* 304 S.C. 551, 406 S.E. (2d) 152 (1991). In *Anderson,* we established as prerequisites for a court's witness the following: (1) the prosecution is unwilling to vouch for the veracity or integrity of the witness, (2) there is a close relationship between the accused and the prospective court's witness, (3) there is evidence that the proposed witness was an eyewitness to the act giving rise to the prosecution, (4) the witness gave a sworn statement concerning the relevant facts which have been or will probably be contradicted, and (5) the absence of the witness' testimony would likely result in a miscarriage of justice. *Id.*

Petitioner relies on *United States v. Karnes,* 531 F. (2d) 214 (4th Cir. 1976) for the proposition that it is an abuse of discretion for a judge to call a court's witness where the government's case is insufficient as a matter of law without the court's witness. Petitioner also contends that due process is violated where the trial judge procures evidence essential to

---

[1] Jason Riddle, a brother of the petitioner, participated with petitioner in the burglary and armed robbery. Jason testified for the State in *Riddle I*, pursuant to a plea agreement. He implicated petitioner ion the murder of Mrs. Mullinax as well as the armed robbery and burglary of her house. At the retrial, *Riddle II*, Jason indicated that he would recant his testimony and was not called as a witness. In *Riddle III*, a pretrial hearing was conducted pursuant to the State's motion that Jason be called as a court's witness.

overcome the presumption of innocence, which the government has declined to present. *Id.*

At the outset, we note that the Fourth Circuit in *Karnes* stands alone among the various jurisdictions around the country in finding a due process violation where the trial judge procures evidence that the government declined to present. In *McCormick on Evidence,* 4th Ed., § 8, p. 23, it is noted that the most common use of a "judge called" witness is "when the prosecution expects that a necessary witness will be hostile and desires to escape the necessity of calling him and being cumbered by the traditional rule against impeaching one's own witness." *Id.* The more obvious reason for this practice is that the prosecution cannot or strategically would not want to be identified with the witness. *Id.*

This common practice has ties to our analysis in *Anderson, supra.* Both *McCormick* and our *Anderson* decision relied on *Beghtol v. Michael,* 80 Md. App. 387, 564 A. (2d) 82 (1989). In *Beghtol,* the five factors used in Maryland for a court to call a witness are identical to the factors which are now the law in South Carolina.

The anomaly that *Karnes* presents is further amplified by *Fed. R. Evid.* 614:

> Calling and Interrogation of Witnesses by Court
>
> (a) Calling by court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
>
> (b) Interrogation by court. The court may interrogate witnesses, whether called by itself or by a party.
>
> (c) Objections. Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present.

*Id.* The notes of the advisory committee which accompanied this rule discuss the authority and reasons for the court to call a witness:

> [W]hile exercised more frequently in criminal than in civil cases, the authority of the judge to call witnesses is well established. *McCormick* § 8, p. 14; *Maguire, Weinstein,* et al. *Cases on Evidence* 303-304 (5th ed. 1965); 9

*Wigmore* § 2484. One reason for the practice, the old rule against impeaching one's own witness, no longer exists by virtue of [*Fed. R. Evid.* 607]. Other reasons remain, however, to justify the continuation of the practice of calling court's witnesses. The right to cross-examine, with at it implies, is assured. The tendency of juries to associate a witness with the party calling him, regardless of technical aspects of vouching, is avoided. And the judge is not imprisoned within the case as made by the parties.

*Id.*

Judge Donald Russell, in his dissent in *Karnes,* noted that the mere calling of a witness by the court did not place the judge in the role of prosecutor. He stated that "[i]f this were true, the trial judge would be prohibited in all instances from calling a person as a court witness." *Id.* 531 F. (2d) at 219. Judge Russell further reasoned that he could not:

see why the importance of the witness' testimony [was] determinative of the right of the trial judge to call him or her as a witness. The very importance of the testimony provides its own justification for the action of the trial judge.

*Id.*

We find Judge Russell's well-reasoned dissent persuasive and flatly reject the rule espoused by the majority in *Karnes.*[2] To accept the logic of *Karnes* as the prevailing rule flies in the of our decision in *Anderson, supra,* and ignores the reasoning of *Fed. Rule of Evidence* 614 and the overwhelming majority of cases from other jurisdictions. *See United States v. Leslie,* 542 F. (2d) 285 (5th Cir. 1976); *see also People v. Rogers,* 187 Ill. App. (3d) 126, 135 Ill. Dec. 65, 543 N.E. (2d) 300 (1989); *Beghtol, supra.* In light of our rejection of *Karnes,* we must now turn to *Anderson, supra,* to complete our analysis.

The present facts fit well within the *Anderson* prerequisites. The State refused to vouch for the witness, and the wit-

---

[2] This opinion is of limited precedential value, even in the Fourth Circuit. The 3-person panel divided 1-1-1. The majority opinion, authored by Judge Winter, which sets forth the rule petitioner would have us adopt, was not joined by Judge Widener. Rather, Widener concurred in result, specifically rejected the analysis of the Winter opinion, and expressed much sympathy for the views espoused by Russell in his dissent.

ness was defendant's brother and co-defendant. The witness also gave, in sworn testimony at the previous trial, an eyewitness account of the crime. The sworn testimony was recanted in a later statement to investigators and his statements on this record clearly indicated his intent to refute his previously sworn testimony. Finally, the absence of the witness' testimony would obviously result in a miscarriage of justice as evidenced by the majority ruling in *Riddle II, supra.*

The decision to make the witness a court's witness has ample support in the record and is upheld under *Anderson.* The rule to be followed in the trial courts of South Carolina when use of a court's witness is contemplated is as follows. The procedure should accord with Federal Rules of Evidence 614 as supplement by *State v. Anderson,* 304 S.C. 551, 406 S.E. (2d) 152 (1991). Thus, while the decision as to whether to call the court's witness is within the discretion of the trial court, such discretion should be exercised only after conducting a hearing outside the presence of the jury, and only if the prerequisites of *State v. Anderson, supra,* have been met.

b. Witness Unavailability and Admission of Prior Testimony

Petitioner next argues that the trial court erred in finding the witness unavailable to testify; however, the State posits that there was no error since the witness refused to take the oath or testify even under a threat of contempt.[3] In *State v. Steadman,* 216 S.C. 579, 59 S.E. (2d) 168 (1950), while acknowledging that the rule in South Carolina was narrow, we noted that the question of availability was not static. In *State v. Doctor,* 306 S.C. 527, 413 S.E. (2d) 36 (1992), we extended the definition of unavailability to include witnesses who assert their privilege against self-incrimination.

The formulation contained in the *Federal Rules of Evidence* is persuasive. *Fed. R. Evid.* 804, provides the definition of unavailability for purposes of the hearsay exception as:

(a) Definition of unavailability. 'Unavailability as a witness' includes situations in which the declarant—

---

[3] The witness, Jason Riddle, entered a plea for his role in the murder, burglary, and armed robbery of Ms. Mullinax. As a result of the plea, the witness was sentenced to two life terms plus twenty-five years. The witness took the position that the six-month sentence for contempt meant nothing, and that he would not take the oath to testify regardless of the trial court's actions.

\* \* \* \* \*

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so. . . .

*Id.* The logic of this rule is compelling and completely consistent with our decisions in this area. On the present facts, a rule which would allow a defendant to hide behind his brother's refusal to testify at a later trial encourages potentially collusive behavior. Furthermore, the sentence for contempt did not serve to encourage the witness' testimony, especially where there was no longer an incentive to testify.

The Petitioner asserts that the State could have revoked the plea agreement for the witness' testimonial noncompliance, and therefore, failed to take every action to obtain the testimony. This argument ignores reality because assuming arguendo that the plea was revoked,[4] The witness could then assert the privilege against self-incrimination and still be unavailable under *Doctor, supra.* Requiring the State to take this extra step would be a futile gesture which serves no logical purpose.

The witness here was unavailable, and his previously sworn testimony which was subject to cross-examination was properly admissible as an exception to the hearsay rule. *See Doctor, supra; see also Steadman, supra.*

3. Victim Impact Evidence

Petitioner asserts that a portion of the testimony given by the victim's stepdaughter, Mrs. Osment, was more prejudicial than probative. Mrs. Osment, who was in the house the night of the murder, armed robbery, and burglary, also testified about the victim's standing in the community, the victim's grandchildren, and the impact the crime had personally on her. During the closing argument, the solicitor made reference to this testimony, and Petitioner asserts that the admission of this evidence along with the solicitor's reference was prejudicial error.

Recently, in *State v. Rocheville,* — S.C. —, 425 S.E. (2d) 32 (1993), we reiterated the adoption in South Carolina of a rule

---

[4] The issue of plea revocation presents enormous constitutional pitfalls which need not be addressed for the current analysis. Suffice it to say on these facts, if the State were required to revoke the plea agreement to force this witness to testify then the end result would most probably be the same.

enunciated in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed. (2d) 720 (1991) in which the prohibition against victim impact testimony was moderated. In *Payne,* the Supreme Court reversed the outright prohibition against victim impact testimony established in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed. (2d) 440 (1987) and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed. (2d) 876 (1989), holding that the Eighth Amendment did not establish a *per se* bar against presentation to the jury of victim impact evidence or against use of such evidence by the prosecutor in closing argument. *Id.* The Supreme Court found that the victim impact evidence was relevant to the "uniqueness" of the individual and only inadmissible where it was so unduly prejudicial that it rendered the trial fundamentally unfair. *Id.* 501 U.S. at —, 111 S.Ct. at 2609, 115 L.Ed. (2d) at 736 (1992); *Rocheville,* 425 S.E. (2d) at 32. In the case at bar, the evidence presented by the State was no more prejudicial than the testimony of the victim's parents describing the victim's dreams and aspirations for the future in *Roche-ville, supra.* Viewed as a whole, the testimony which Mrs. Osment gave was relevant to establish the victim as a unique human being, and to show the specific harm committed by Petitioner in the murder, armed robbery, and burglary. *See also State v. Johnson,* 306 S.C. 119, 410 S.E. (2d) 547 (1991), *cert. denied,* — U.S. —, 112 S.Ct. 1691, 118 L.Ed. (2d) 404 (1992). We therefore affirm the trial court on this issue.

4. Disqualification of Venireman

The next issue Petitioner raises is whether the trial judge erred in disqualifying a venireman for cause. The appropriate test for whether a juror is qualified to serve on a capital sentencing jury was announced in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed. (2d) 841 (1985). In *Wainwright,* the Supreme Court held that prospective jurors may be excluded for cause if their views on the death penalty would prevent or substantially impair the performance of their duties as jurors in accordance with their oath and duties as prescribed under the law. *Id.*

In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed. (2d) 137 (1986), the Supreme Court held that a defendant's right to a jury which is comprised of a cross-section of

the community is not impaired by the exclusion of veniremen who are categorically opposed to the death penalty. *Id.* We fully embraced these rules in *State v. Kornahrens*, 290 S.C. 281, 350 S.E. (2d) 180 (1986) by upholding a judge's decision to excuse potential jurors for cause based on their inability to impose the death penalty.

Petitioner argues that the judge applied an inappropriate standard to excuse the potential juror, and therefore, the exclusion was error. The Petitioner then points to *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed. (2d) 622 (1987) (inappropriate exclusion of a potential juror can never be harmless error) for the proposition that the exclusion mandates reversal.

The difficulty with Petitioner's reliance on *Gray* is that it presupposes error by the trial judge in the dismissal of the juror. The potential juror, Reverend Hicks, began her answers to *voir dire* questioning by stating to the trial judge "[m]y beliefs, my Christian beliefs would hinder me from sentence [sic] anyone to the death penalty. Because I am a minister of the gospel." (ROA p. 853) From the very outset, it was apparent that her religious beliefs would prevent her from imposing the death penalty. Throughout the questioning by attorneys, Reverend Hicks was unable to say that she would ever consider the death penalty, and to the contrary, she repeatedly stated that she couldn't give the death penalty. When her answer are considered in their entirety, it is very evident that Reverend Hicks would face a moral dilemma which would substantially impair her ability to recommend the death sentence, regardless of her oath or legal instructions.

Because the record supports the finding that Juror Hicks would be substantially impaired, by both her personal and religious beliefs, from imposing a capital sentence in accordance with her oath and instructions, we affirm on this issue.

5. *Batson* Challenge

Petitioner asserts that the trial judge erred in accepting the State's explanations for peremptory strikes of two black potential jurors, Mrs. Floyd and Mr. Boyd. Jury selection consisted of accepting eight blacks and four whites, with one black and one white alternate juror. During

jury selection, the State exercised all five peremptory strikes against five black jurors and one white alternate juror. The Petitioner exercised nine peremptory strikes against white jurors. At the conclusion of jury selection, the Petitioner, who is white, moved to quash the petit jury under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. (2d) 69 (1986).

The trial judge conducted an *in camera Batson* hearing to determine the State's racially neutral reason for exercising all five peremptory strikes against blacks. The State analyzed each of the five jurors peremptorily challenged and pointed out that each juror had vacillated on their responses on *voir dire* as to whether they could impose the death penalty. The Petitioner concedes that with three of the five jurors, the explanation was satisfactory; however, Petitioner asserts that two jurors' responses did not justify the State's challenge.

In *State v. Elmore*, 300 S.C. 130, 386 S.E. (2d) 769 (1989), we recognized that vacillating responses by a potential juror on *voir dire* about the imposition of the death penalty was a racially neutral explanation for a peremptory challenge. A racially neutral reason, however, can be negated showing that the solicitor created a pretext for purposeful discrimination by applying his allegedly racially neutral standard in a discriminatory manner. *State v. Oglesby*, 298 S.C. 279, 379 S.E. (2d) 891 (1989). This Court has made clear that whether a proffered reason is racially neutral is to be determined by examining the totality of the facts and circumstance *in the record* surrounding the strike, including the credibility and demeanor of the individual called upon to explain his strike. *State v. Patterson*, 307 S.C. 180, 414 S.E. (2d) 155 (1992); *State v. Davis*, 306 S.C. 246, 411 S.E. (2d) 220 (1991); *State v. Green*, 306 S.C. 94, 409 S.E. (2d) 785 (1991); *State v. Oglesby, supra.*

In the present case, there is nothing in the record to indicate that the Solicitor seated a white juror who vacillated during *voir dire*. In fact, it is clear that no such vacillation by a seated white juror took place, yet the Petitioner asserts that the Solicitor's racially neutral reason was insufficient to warrant the peremptory strike against Mrs. Floyd and Mr. Boyd. We have held that a solicitor may view the entirety of the juror's *voir dire* responses to determine whether to accept or reject the juror, and where responses are subject to more than one conclusion, a reviewing court will not substitute its

own opinion for that of the solicitor. *State v. Woodruff*, 300 S.C. 265, 387 S.E. (2d) 453 (1989).

The State's reasoning for striking the two jurors finds support in the record.[5] Both jurors did vacillate in their responses on *voir dire*, and although the vacillation was insufficient to justify their challenge for cause, the State was justified in exercising the peremptory challenges. Secondly, the record does not support the claim that the State's use of peremptory challenges was merely a pretext.

Because the evidence in the record shows that the Solicitor's racially neutral reasoning was not a mere pretext, and because the trial judge's findings should be given great deference, we affirm the trial court on this issue. *See Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed. (2d) 395 (1991); *Batson, supra; Woodruff, supra.*

6. Admission of Photographic Evidence

Petitioner asks us to find that the trial judge abused his discretion by admitting a black and white photograph of the victim taken at the scene of the crime. The Petitioner argues that the previous graphic testimony given by the investigator who photographed the crime scene, when coupled with an actual photograph, served to unduly prejudice the Petitioner.

In *Kornahrens*, 290 S.C. at 281, 350 S.E. (2d) at 180, we held that photographs of a grave site and the victim's body were admissible in the sentencing phase of a capital trial to show the circumstances of the crime and the character of the defen-

---

[5] Here, a review of the record shows in that in response to the initial questions from the court, Mrs. Floyd stated that she did not believe in the death penalty (ROA p. 495). On examination by the Petitioner, Mrs. Floyd opined that she did not "know about could I consider it being the death" (ROA p. 498). She also stated that she had children of her own and that she did not want the death penalty to happen to her children or to anybody else (ROA p. 498-99). Petitioner, after some difficulty, was able to rehabilitate Mrs. Floyd, and the questioning in its entirety shows that Mrs. Floyd ultimately was qualified to serve.

Mr. Boyd, while qualified to serve, exhibited vacillation during his examination by the Solicitor. Mr. Boyd stated that if he were in the legislature, he would abolish the death penalty (ROA p. 237), that he would not vote for the death penalty at trial, and even after rehabilitation, he stated that the death sentence would "be on my conscious [sic] . . ." (ROA p. 246). The Solicitor did not challenge for cause, but he asked that it be noted in the record that Mr. Boyd vacillated (ROA p. 247). This contemporaneous notation by the Solicitor, although by itself not dispositive, does lend credence to the racially neutral reasoning put forth by the State.

dant. It is well settled law that in a bifurcated capital proceeding, additional evidence may be presented which is relevant to extenuation, mitigation, or aggravation. *Id; see State v. Shaw,* 273 S.C. 194, 255 S.E. (2d) 799 (1979); *see also State v. Woomer,* 278 S.C. 468, 299 S.E. (2d) 317 (1982). This evidence includes photographs which depict the victim's body in, "substantially the same condition in which the defendant left [it]." *Id.* 290 S.C. at 289, 350 S.E. (2d) at 185.

It is also settled law that evidence should be excluded where its probative value is outweighed by its prejudicial effect. *See State v. Alexander,* 303 S.C. 377, 401 S.E. (2d) 146 (1991). Petitioner argues that our decision in *State v. Patrick,* 289 S.C. 301, 345 S.E. (2d) 481 (1986) is a basis for finding that the photograph of the victim was unduly prejudicial. In *Patrick,* the State introduced a color photograph taken of the victim on the autopsy table to depict the entry wound. Our opinion noted that the extremely graphic photograph did not show the crime scene or any postmortem abuse. *Id.*

The photographs in this case are distinguishable from those introduced in *Patrick.* The black and white photograph admitted at trial depicted the victim at the crime scene, and was selected specifically because it was the least graphic of the photographs available. Furthermore, the Court in *Kornahrens* cautioned that the "discussion in *Patrick* of the photograph issue must be read in light of reversal on another issue." *Kornahrens,* 290 S.C. at 289 n. 5, 350 S.E. (2d) at 186 n. 5. Similarly, the photographs at issue in *State v. Middleton,* 288 S.C. 21, 339 S.E. (2d) 692 (1986) were also depictions of the victim at autopsy. Therefore, Petitioner's reliance on either case is misplaced.

The present black and white photograph taken at the crime scene supported testimony of several witnesses and was relevant to the nature of the crime and defendant's character.

7. Proportionality Review

Pursuant to S.C. Code Ann § 16-3-25(C) (1985), we must review the record to determine whether the death sentence was the result of passion, prejudice, or other arbitrary factors, and that the evidence supports the jury's finding of aggravating circumstances. The review also mandates that we determine if the death sentence is excessive or disproportionate to the penalty imposed in similar cases.

A review of the facts in this case supports the jury's verdict and our previous capital punishment decisions reveal that the death sentence is not disproportionate to the penalty imposed in similar cases. *See State v. Simmons*, — S.C. —, 427 S.E. (2d) 175 (1993); *State v. Bell*, 305 S.C. 11, 406 S.E (2d) 165 (1991).

We, therefore, AFFIRM the trial court's imposition of the death sentence.

HARWELL, C.J., and CHANDLER and MOORE, JJ., concur.

FINNEY, J., concurs in result.