2380

Edgar PAYTON, Respondent v. Tina L. KEARSE, Appellant.

(460 S.E. (2d) 220)

Court of Appeals

192

*Lewis C. Lanier* and *Paul W. Owen, Jr.* both of *Horger, Horger & Lanier,* Orangeburg, *for appellant.*

*Daniel W. Williams* of *Bedingfield & Williams,* of Barnwell; and *J. Paul Detrick* of *Peters, Murdaugh, Parker, Eltzroth & Detrick,* Hampton, *for respondent.*

Heard Mar. 9, 1995.

Decided July 17, 1995; Reh. Den. Aug. 18, 1995.

HOWELL, Chief Judge:

In this automobile negligence case, the jury returned a verdict of $700,000 actual damages in favor of Edgar Payton against Tina Kearse. Kearse appeals, raising several issues relating to the jury selection, the admissibility of evidence, the jury charge, and the directing of a verdict for Payton on liability. We affirm.

The accident occurred on September 7, 1990, in Allendale County. Payton, a farmer, was checking some of his fields and helping to move his combine to another location. He was following the combine in his personal vehicle on Highway 125. The weather was clear and sunny. Payton attempted to pass the combine, but could not do so because of oncoming traffic. He pulled back into his lane of travel behind the combine. The vehicle driven by Kearse was approaching Payton from the rear. Kearse testified that she saw Payton attempt to pass the combine and also saw him pull back into his lane. When Payton attempted to pass, Kearse reduced her speed, but after Payton returned to his lane, she "picked [her] speed back up." Kearse testified that she applied her brakes, but struck Payton in the rear after he pulled back into his lane of travel. She admitted she was traveling too fast and could not stop. The trial judge granted Payton's motion for a directed verdict on liability.

After the accident, Payton began experiencing problems with hearing loss, ringing in the ears, and dizziness. He also suffered from neck pain and decreased range of motion in his neck. Payton was treated by several doctors, including an otolaryngologist, an orthopaedic surgeon, and a neurologist. The otolaryngologist testified that Payton had bilateral sensory neural deafness with secondary tinnitus. It was his opinion that the accident caused the problem and that the tinnitus, hearing loss, and dizziness would probably get worse so that Payton could not return to farming.

The neurologist testified that Payton had a C6-C7 disk herniation with compression of C7 bilaterally and a concussion with post-concussive vertigo. The neurologist also found Payton had some weakness in his arms and hands. A CT scan confirmed damage to Payton's neck at the C6-C7 level. Because Payton's dizziness and tinnitus persisted, he underwent an arteriogram to determine whether his vertebral arteries had been damaged in the accident. While the arteriogram was normal, Payton's femoral nerve was damaged during the test, causing pain and numbness in his right thigh. The neurologist testified that Payton's problems had persisted for two years after the accident and that, in his opinion, Payton would be limited in what he could do in the future and could not return to work as a farmer. Payton became depressed after the accident, and was referred to a psychiatrist, who prescribed medication and therapy. He testified that Payton was suffering from a major depression due to his injuries and was experiencing a loss of self-esteem because he could not work. A vocational rehabilitation counselor also testified that Payton was totally vocationally disabled in his present condition.

## I.

Kearse raises several issues on appeal with respect to the jury selection process. In order to address these issues, it is necessary to understand the rather tortured procedural history of this case. Payton is a resident of Barnwell County, and the action was originally filed in Barnwell County. Kearse moved for and was granted a change of venue to Allendale County, where she resided. After the case was transferred to Allendale, Payton hired Paul Detrick to serve as co-counsel on this case. Mr. Detrick practices law in Allendale and Hampton counties, and also serves as a part-time assistant solicitor in Hampton, Allendale, and Jasper counties. Kearse then again sought to change venue from Allendale County to Aiken County, on the grounds that many of the witnesses lived or worked in Aiken County, and that Detrick's position as solicitor and "champion of the people" would prevent her from receiving a fair trial. This motion was denied.

Prior to jury selection, the court posed a number of voir dire questions to the jury. The court asked several questions about pending criminal cases, plea agreements, and pretrial

intervention. No member of the venire responded to these questions. However, after a list of twenty potential jurors was drawn, Kearse challenged the entire venire, contending that several members of the venire did not respond truthfully to voir dire questions concerning criminal charges. According to Kearse, Mr. Priester pleaded guilty to a second offense driving under the influence; Mr. Washington had pending criminal charges; and Mr. Van Courtland had been placed in pretrial intervention for charges of receiving stolen goods and carrying a pistol. Mr. Van Courtland's mother was also a member of the venire, and did not respond to a question relating to family members of persons who had criminal charges. The court noted it had already excused Mr. Washington from service, and then removed Mr. Priester and Mr. Van Courtland from the pool before he requestioned the venire and drew a second list of jurors. After the jury was selected and sworn, Kearse renewed her motion to quash the venire because Mrs. Van Courtland had been seated on the jury. The court denied the motion to quash, but replaced her with an alternate. Kearse also argued that Mr. Robinson, another member of the venire, had a criminal record which he did not disclose to the court during questioning. However, Kearse did not challenge Mr. Robinson after the first voir dire, and did not request that Mr. Robinson be removed from the venire. Moreover, Mr. Robinson did not serve on the jury because Kearse exercised a peremptory strike against him. Thus, none of these challenged members of the venire served on the jury.

After the parties exercised their jury strikes on the second list, Kearse challenged Payton's use of his peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. (2d) 69 (1986). The court held a hearing and determined that Payton exercised the strikes in a racially neutral manner. After the jury was sworn, Payton presented his first witness, a highway patrolman. After he testified, one of the jurors notified the court she had a conflict of interest because she thought Payton was her fourth cousin. The court removed her from the jury and seated an alternate juror. Kearse moved for a mistrial and renewed her earlier motions, arguing that the juror had infected the jury panel, and that it would be impossible for Kearse to obtain a fair trial given the jury panel's failure to accurately respond to voir dire. These motions were denied.

After the trial and during argument on new trial motions, Kearse advised the court that one of the seated jurors did not disclose his criminal record during voir dire. Kearse again argued she was denied a fair trial because so many members of the venire lied under oath. The trial court denied the new trial motion in all respects with regard to the jury selection process.

On appeal, Kearse challenges the trial court's failure to quash the venire, grant a change of venue, grant a mistrial, or grant a new trial. Kearse's arguments concern (1) the alleged failure of a number of the venire to accurately respond to voir dire questions; (2) Payton's exercise of peremptory challenges; and (3) the court's failure to grant a mistrial after a juror revealed she was related to Payton, and after it was discovered that a seated juror did not truthfully respond to voir dire. We address each issue individually.

(a)

Kearse argues the court erred in its ruling on her various motions[1] with regard to the venire. She asserts a significant number of potential jurors failed to respond accurately to voir dire and, therefore, she was denied her right to a fair and impartial jury. Kearse contends, in essence, that because some members of the venire were not truthful, the other members of the venire likewise must have lied. In her brief, Kearse maintains that

> [t]he true irony of this case is that the information that revealed [the challenged jurors'] indiscretions was publicly available. Which leaves the Appellant with a single question[:] If jurors are willing to misrepresent themselves under oath before the court when information to prove that they are lying is publicly available then what other interests in the case are the remaining jurors withholding?

We do not accept this argument, and refuse to impute any misconduct of certain individuals to the entire venire. The burden is upon a person challenging the jury array to offer

---

[1] At trial, Kearse variously sought a change of venue, a new jury panel, and a new trial based on the apparently untruthful responses to voir dire.

strong evidence in support of his motion; failure to do so is fatal. *State v. Rogers*, 263 S.C. 373, 210 S.E. (2d) 604 (1974). Moreover, the objection must go to the entire array, not merely to individual persons. *Id.* Here, objections to specific venire members were handled by the court either removing the person from the venire or replacing a chosen juror with an alternate. Further, Kearse exercised one of her peremptory strikes to remove an objectionable person from the list of potential jurors. Kearse has presented no evidence that the venire itself was tainted. Rather, we conclude the jury selection process worked appropriately to ensure a fair and impartial jury, given the court's responses to raised objections and the commendable efforts of Kearse's counsel to prepare for jury selection. We therefore find the trial court properly denied Kearse's objections relating to the venire.

To the extent that Kearse's motion to change venue to Aiken County warrants separate consideration, we note that a motion for change of venue is addressed to the sound discretion of the trial judge, whose ruling will not be disturbed unless it appears that manifest legal error was committed. *Turner v. Santee Cement Carriers, Inc.*, 277 S.C. 91, 282 S.E. (2d) 858 (1981). The trial was moved to Allendale County at Kearse's request. The accident occurred in Allendale County, and the parties and many of the witnesses resided in either Allendale or Barnwell counties. The fact that some of the expert witnesses lived or worked in Aiken County is not sufficient to support a change of venue to that county. *Id.*

We likewise reject the argument that a change of venue was required because Kearse could not receive a fair trial in Allendale, given Mr. Detrick's position as an assistant solicitor in Allendale. It is generally proper for a part-time solicitor to represent a party in a civil action, provided the action does not arise out of a criminal prosecution handled by the solicitor's office. *See, e.g.*, S.C. Bar Ethics Advisory Op. 84-14; *see also* S.C. Code Ann. § 17-1-20 (1976). Kearse has presented no evidence showing that the presence of Mr. Detrick in fact prevented her from obtaining a fair and impartial jury; any suggestion that it was Mr. Detrick's presence which caused some members of the venire to be untruthful is simply conjecture and speculation. We therefore find no

error in the trial court's denial of Kearse's change of venue motion.

## (b)

Kearse maintains the court erred in failing to grant her motion for a mistrial or a new trial based upon the disclosure of a seated juror's familial relationship with Payton and a seated juror's failure to disclose a criminal record. As previously noted, after one witness had testified, juror Hartzog informed the court she believed she was a distant relative of Payton. The court removed her from the jury and seated an alternate. After the trial, Kearse advised the court that Mr. Crawford, another seated juror, did not reveal he had pending criminal charges or was involved in a pretrial intervention program. We find no error in the court's handling of these matters.

The decision to grant or deny a mistrial is within the discretion of the trial judge, and his decision will not be disturbed absent an abuse of discretion which prejudices the party requesting the mistrial. *State v. Dawkins*, 297 S.C. 386, 394, 377 S.E. (2d) 298, 302 (1989). The court correctly removed Ms. Hartzog after she voluntarily revealed a familial relationship. This event took place early in the trial, after only the opening statements and the testimony of one witness. Kearse has presented no evidence to show that, during her short stay on the jury, Ms. Hartzog exercised any undue influence or otherwise tainted the remaining jurors. Therefore, considering the point during the trial that the disqualification occurred, and the court's instruction to the jury not to discuss the case, we fail to see how Kearse was prejudiced. Accordingly, the trial court did not err in refusing to grant a mistrial. *See State v. Savage*, 306 S.C. 5, 409 S.E. (2d) 809 (Ct. App. 1991), *cert. denied* (Jan. 22, 1992) (no abuse of discretion in refusing to grant mistrial when defendant learned after the verdict that a juror was the third cousin of a witness); *cf. Smith v. Quattlebaum*, 223 S.C. 384, 76 S.E. (2d) 154 (1953) (no abuse of discretion in refusing to grant a new trial after it was discovered that, through inadvertence, a juror had not disclosed his relationship to a party).

As to the second juror, the trial court denied Kearse's motion for a new trial, finding Kearse failed to establish Mr. Crawford in fact had criminal charges pending

against him. While the record reveals that Mr. Crawford was arrested, the charges against him were "no billed" by the grand jury well before the trial of this case. Thus, the trial court properly held that there were no pending criminal charges against Mr. Crawford, and that he truthfully answered the voir dire questions.

Kearse also argues on appeal that Mr. Crawford failed to disclose that he had been involved in a pretrial intervention program.[2] However, we do not reach this issue. While Kearse raised the juror's failure to respond to the voir dire question about pretrial intervention, the trial court did not mention or rule on this issue in its order denying Kearse's posttrial motions, and Kearse did not request a ruling on the issue by way of a Rule 59(e) motion. The issue therefore is not preserved for appeal. *See Tally v. S.C. Higher Educ. Tuition Grants Comm.*, 289 S.C. 483, 347 S.E. (2d) 99 (1986) (an issue raised to but not ruled on by the trial court is not preserved and the complaining party must move to amend the judgment pursuant to Rule 59(e), SCRCP). Accordingly, we find no error in the trial court's denial of Kearse's new trial motions based on jurors Hartzog and Crawford.

(c)

Kearse's final argument on jury selection deals with Payton's peremptory strikes and the court's conclusion the strikes were exercised in a racially neutral manner. Both Payton and Kearse are black; Payton exercised all of his peremptory strikes against whites. Kearse maintains Payton's exercise of his strikes were based upon race in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. (2d) 69 (1986), and *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed. (2d) 660 (1991). Payton's counsel gave the following explanations for the jury strikes:

Juror number one:

"This is a[n] elderly lady who's husband—she is known to be very, very, very conservative. She—our information is

---

[2] It appears from the record that Crawford began but did not complete the pretrial intervention program, and a motion to restore the criminal charges was filed by the solicitor. The notice to restore, however, indicates that the charge for which Mr. Crawford apparently entered the program was "no billed" by the grand jury.

that she does not believe in legal actions involving automobile wreck cases and because of that and the fact that her husband is also known to be that way in the community, we struck her."

Juror number seventeen:

"He's known in the Fairfax community as [a] very conservative person and has—I don't think—I won't say—has feelings towards the normal, average black person, We just don't feel like—our plaintiff is a black person who started off low, from a nothing to, hopefully, something, and that's what this case is all about. We do not feel like he could identify with not one iota of the situation that Mr. Payton finds himself in. That's the reason we struck him."

Juror number eighteen:

"[S]he is known as [a] very opinionated person, your honor, who expresses herself. We knew if she got on that jury she was not gone [sic] budge one way or the other; that she was gone [sic] get her way or no way. That was our opinion from what we had learned. Her family has—Mr. Lanier has talked about the number of people in trouble. She herself has not had any problems but she comes from a family that's had some problems with the law and she's kind of what we refer to as a redneck variety, so to speak, and that was the reason we struck her and, as you also know, your honor, I was concerned with her family, whether she had any problems with me or the law because some members of her family might have problems with the law."

Juror number five:

"Frankly, we considered leaving her on this jury because she—as far as herself is concerned, she's known as a nice person; however, her husband is in the insurance business and we were concerned that the relationship of husband and wife, might be some problems there. She is also a registered nurse and it's been my experience, unfortunately bad experiences with registered nurses on juries. That's the reason we struck her."

Alternate:

> "Mr. Pinckney is a security guard, your honor, and he—we were concerned about what kind of problems he had had with blacks and such, in the security business. We also understand he's a very, very, conservative person who is not—I won't call anybody a racist but he's got mixed opinions about black people."

The record contains no information about the remaining members of the jury panel.

It is well settled that the Fourteenth Amendment pro-██ ██ hibits the use of peremptory strikes in a discriminatory manner. This prohibition applies in civil cases as well as criminal cases. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed. (2d) 660 (1991); *Chavous v. Brown*, 299 S.C. 398, 385 S.E. (2d) 206 (Ct. App. 1989); *rev'd*, 302 S.C. 308, 396 S.E. (2d) 98 (1990), *vacated*, 501 U.S. 1202, 111 S.Ct. 2791, 115 L.Ed. (2d) 966, *aff'd on remand*, 305 S.C. 387, 409 S.E. (2d) 356 (1991). Moreover, a party has standing to object to race-based peremptory strikes of venirepersons even if the challenging party and the potential juror are not of the same race. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed. (2d) 411 (1991); *State v. Dyar*, 317 S.C. 77, 452 S.E. (2d) 603 (1994).

Once a prima facie case of the improper use of strikes ██ has been established,[3] the burden shifts to the other party to provide a race-neutral explanation for the use of the strikes. *State v. Green*, 306 S.C. 94, 409 S.E. (2d) 785 (1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1566, 118 L.Ed. (2d) 212 (1992). In order to rebut a *Batson* challenge of discrimination, the explanation for the jury strike must be (1) neutral, (2) related to the case to be tried, (3) clear and reasonably specific, and (4) legitimate. *State v. Tomlin*, 299 S.C. 294, 384 S.E. (2d) 707 (1989).[4] Whether a proffered reason is

---

[3] In *State v. Chapman*, 317 S.C. 302, 454 S.E. (2d) 317 (1995), our Supreme Court held that a prima facie case is established whenever a party requests a *Batson* hearing.

[4] *But see Purkett v. Elem*, — U.S. —, 115 S.Ct. 1769, 131 L.Ed. (2d) 834 (1995) (to rebut a prima facie case of discrimination, the proffered reason must only be facially neutral; the explanation need not be "persuasive, or even plausible.").

racially neutral must be examined in light of the totality of the facts and circumstances in the record surrounding the strike, including the credibility and demeanor of the individual called upon to explain his strike. *Riddle v. State,* 314 S.C. 1, 443 S.E. (2d) 557 (1994), *cert. denied,* — U.S. —, 115 S.Ct. 518, 130 L.Ed. (2d) 424 (1994). Unless a discriminatory intent is inherent in the proffered reason, it will be deemed race neutral. *State v. Green,* 306 S.C. at 97, 409 S.E. (2d) at 787. Age, demeanor, or disposition of the juror may constitute a legitimate, race neutral reason for a peremptory challenge. *State v. Geddis,* 313 S.C. 37, 437 S.E. (2d) 31 (1993); *State v. Wright,* 304 S.C. 529, 405 S.E. (2d) 825 (1991); *State v. Southerland,* 316 S.C. 377, 447 S.E. (2d) 862 (1994), *cert. denied,* — U.S. —, 115 S.Ct. 1136, 130 L.Ed. (2d) 1096 (1995).

As to jurors one and five, Payton's explanation for the strikes established that the jurors were struck because of potential bias against Payton's claim. The explanations are race neutral, legitimate, specific, and clearly related to the case to be tried. Thus, as to jurors one and five, there was no *Batson* violation.

We likewise find no *Batson* violation with regard to juror number seventeen and the alternate. The explanations reveal that these jurors were struck because Payton's attorney had information that they were likely to be biased against Payton because of his race. The reason is legitimate, and clearly related to the case. We also find the reason to be racially neutral. Prejudice and bigotry are certainly found in all races. *Batson* and its progeny prohibit a plaintiff or defendant from striking a juror solely because of the juror's race, or because of the party's stereotypical assumptions about the juror based on the juror's race. However, *Batson* cannot be interpreted to prevent a plaintiff from striking a juror the plaintiff knows to be biased or prejudiced against the plaintiff because of the *plaintiff's* race. It is evident from the proffered explanations that Payton had specific information about these jurors, and was not making generalizations about the jurors' attitudes simply because the jurors were white.

Payton's explanation for his strike against juror eighteen, however, is somewhat problematic. The description of the juror as opinionated and stubborn relate to

demeanor and disposition, and would normally be considered legitimate, racially neutral explanations for a peremptory strike. *State v. Wright.* The troublesome issue, however, is counsel's reference to the juror as a "redneck." Kearse contends that "redneck" is a derogatory racial term, and that Payton's use of the term is evidence of her intent to discriminate, and constitutes a *Batson* violation. Thus, under Kearse's view, the invalid reason ("redneck") contaminates the entire explanation for the strike, and results in a *Batson* violation without regard to the other valid reasons for the strike.

Payton, however, argues that "redneck" was not used as a racial term, but was used in connection with his description of the juror's family as one that had problems with the law. According to Payton, "redneck" is not a racial term because it "is almost always used by whites to describe other whites." We need not delve into the question of whether or not "redneck" is a racial term.[5] We will assume for the purposes of this opinion that "redneck" is a racial term; however, the question then becomes whether a peremptory strike motivated in part by race *necessarily* constitutes a *Batson* violation when other legitimate, racially neutral reasons are given for the strike. We conclude it does not.

*Batson's* prohibition against discriminatory exercises of peremptory strikes is grounded in the Equal Protection clause of the Fourteenth Amendment. *See Batson,* 476 U.S. at 89, 106 S.Ct. at 1719. Thus, as with other types of Equal Protection cases, the guiding purpose behind *Batson* and its progeny is to prohibit purposeful, invidious discrimination. *Id.* In other areas of Equal Protection jurisprudence *it is* firmly established that an action motivated in part by an impermissible reason will nonetheless be valid if the same action would have been taken in the absence of the impermissible motivation. *See Mt. Healthy City Sch. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. (2d) 471 (1977). We see no reason why *Batson* claims should be treated differently. *See*

---

[5] One dictionary defines a redneck as "1. A member of the white rural laboring class, esp. in the southern United States. 2. . . . A person who advocates a provincial, conservative, often bigoted sociopolitical attitude considered characteristic of a redneck." *The American Heritage Dictionary* 1037 (2d College Ed. 1982).

*Howard v. Senkowski,* 986 F. (2d) 24 (2d Cir. 1992) dual motivation analysis under the Equal Protection clause is applicable to *Batson* claims); *see also United States v. McMillon,* 14 F. (3d) 948, 952, n. 3 (4th Cir. 1994) (a showing of pretext does not automatically result in a finding of discrimination; the defendant must show, "through all relevant circumstances, that the prosecutor intentionally exercised his strike because of racial concerns.").

Ultimately, it is the trial court which must determine whether a party has engaged in purposeful discrimination through the exercise of peremptory strikes. An invidious discriminatory purpose may be inferred from the totality of the relevant facts; however, the trial court's finding at this stage will largely turn on an evaluation of credibility. *State v. Green,* 306 S.C. 94, 409 S.E. (2d) 785 (1991). As the United States Supreme Court has recognized, the decisive question often will be whether the proffered explanation should be believed:

> There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed. (2d) 395 (1991) (citations omitted). Whether a *Batson* violation has occurred must be determined by examining the totality of the facts and circumstances in the record. *Riddle v. State.* Here, the trial court found that there was no *Batson* violation. While the court did not specifically inquire into Payton's apparent dual motivation for striking juror eighteen, by finding no *Batson* violation, the court necessarily found that there had been no purposeful discrimination, a finding which is entitled to great deference. *Hernandez; State v. Green,* 306 S.C. at 98, 409 S.E. (2d) at 788. Moreover, our review of the record and the explanation of the strike satisfy us that Payton would have struck the juror even absent a consideration of her familial origins. Payton's explanation for the strike demonstrates specific knowledge of the juror's personality and disposition, particularly her unwillingness to listen to the

opinion of others. Given the nature of the jury's function, and the importance of interaction between the jurors, this reason alone would have supported the peremptory strike.

In *State v. Martinez*, 294 S.C. 72, 362 S.E. (2d) 641 (1987), the State offered as reasons for striking two jurors that the jurors were of the same sex and age group as the defendant, and that they had possible criminal records. The defendant contended that because the State did not strike white jurors who were the same age as the defendant, the strikes were racially motivated and improper. Our Supreme Court rejected this argument, stating it "ignores the fact that both [j]uror[s] . . . were noted as having possible criminal records." *Id.* at 73, 362 S.E. (2d) at 641. Thus in *Martinez*, the invalid reason (age, when whites of same age were not struck) did not taint the other valid reason (possible criminal record). The same approach is applicable here. While striking a white juror because she comes from a "redneck" family arguably is invalid, there is no *Batson* violation because Payton offered other legitimate and compelling reasons for the strike.

Of course, we do not suggest that an invalid reason will never taint a valid explanation for a peremptory strike. We emphasize that the determinative issue is whether, in light of the totality of the circumstances, a party engaged in purposeful, invidious discrimination. In some cases the invalid reason may be so patently racial or derogatory in nature that the trial court or this court will determine that the invalid reason was in fact the controlling reason for the strike. *See, e.g., State v. Tomlin*, 299 S.C. 294, 384 S.E. (2d) 707 (1989) (while other valid reasons were given for strike of a black male, the solicitor's statement that he struck the juror because he "shucked and jived" while approaching the microphone evidenced the State's "subjective intent to discriminate,"and constituted a *Batson* violation).

## II.

Kearse also raises several challenges to the admission of evidence at trial. We address these issues separately.

### (a)

Kearse contends the court erred in permitting Dr. Martin Zwerling, an otolaryngologist, to testify about the results of tests he performed on Payton the Saturday

before trial because this testing was not disclosed in answers to interrogatories. Dr. Zwerling examined Payton on two occasions: April 5, 1991, and the Saturday before trial, which began on Wednesday, September 1, 1993. He was identified as a potential witness and his deposition was taken in 1992. Dr. Zwerling testified that his tests of Payton in 1991 revealed nerve damage and a hearing loss in both ears. Over objection, Dr. Zwerling testified that the repeat tests performed before trial confirmed that Payton's symptoms were consistent with the prior testing, but showed a worsening of the hearing loss.

When determining the sufficiency of interrogatory responses, each answer must be read in light of the question asked. *Baughman v. American Tel. & Tel. Co.*, 306 S.C. 101, 410 S.E. (2d) 537 (1991). Kearse did not include the interrogatories and responses in the record;[6] we therefore cannot determine whether the interrogatories required Payton to disclose the pretrial examination. However, there is a continuing duty to supplement responses with new information concerning the identity of persons having knowledge of discoverable matters and persons expected to be called as expert witnesses. *Id.;* Rules 33(b) and 26(e)(1), SCRCP. Here, Kearse knew that Dr. Zwerling would be called as a witness, and learned the substance of his testimony through his deposition. The pretrial tests simply confirmed the prior findings which were known to Kearse. Thus, while it would have been more appropriate for Payton to advise Kearse of the new testing before the start of trial, we find no abuse of discretion in the court's decision to permit Dr. Zwerling to testify about the recent tests.

### (b)

Pickens Williams, a former business acquaintance of Payton, testified about Payton's farming ability and the changes he observed in Payton since the accident. Williams testified that Payton owed approximately four hundred thousand dollars to his former business, Still & Williams, Inc. which had gone into bankruptcy. Kearse argues the court erred in refusing to admit certain documents relating to the corporate existence of Still & Williams, Inc., and the debt

---

[6] The Supreme Court denied a motion to supplement the record.

owed by Payton. She argues the documents were relevant to show bias on the part of Williams.

The admission or exclusion of evidence is a matter within the sound discretion of the trial court and, absent clear abuse, will not be disturbed on appeal. Any error in excluding evidence warrants reversal only if the appellant can show both the error of the ruling and resulting prejudice. *Recco Tape & Label Co. v. Barfield,* — S.C. —, 439 S.E. (2d) 838 (1994). Williams testified on both direct and cross-examination about the existence of and the amount of the debt Payton owed to the company. While Williams also testified that he considered the debt to be discharged, the jury was made aware of Williams' potential interest in the case through his testimony about the debt. Because the documents sought to be introduced by Kearse were cumulative, Kearse was not prejudiced by the court's refusal to admit the documents. *Weir v. Citicorp Nat'l Servs., Inc.,* — S.C. —, 435 S.E. (2d) 864 (1993) (refusing to admit cumulative evidence is not prejudicial error).

### (c)

Dr. William Stewart, a vocational rehabilitation counselor, testified about his testing and evaluation of Payton. Kearse argues the court erred in permitting Stewart to testify about medical and psychological issues which were not within his area of expertise. Kearse contends that Dr. Stewart improperly gave medical opinions and testified about treatments Payton may need in the future. We disagree.

Dr. Stewart has a doctorate degree in rehabilitation counseling and educational psychology. He was qualified without objection as an expert in vocational counseling and rehabilitation. Dr. Stewart interviewed and tested Payton, and he also reviewed Payton's other medical and psychological records. Stewart then conducted a labor market study to determine jobs Payton was qualified to perform. He testified Payton was totally vocationally disabled in his present condition. Over objection, Dr. Stewart testified that Payton's medical problems, including the tinnitus and depression, interfered with concentration and memory which can lead to a corresponding breakdown in stamina and endurance to work. Stewart recom-

mended ongoing medical care and treatment to assist Payton including, from a rehabilitation standpoint, a traumatic brain injury program to help him improve his quality of life. We find no error in the admission of this testimony. Dr. Stewart did not give or make a medical diagnosis. Rather, he testified based upon his own expertise, testing, and medical information which he would normally rely upon in formulating his opinion as a vocational rehabilitation counselor. *See Lucas v. Sara Lee Corp.*, 307 S.C. 495, 415 S.E. (2d) 837 (Ct. App. 1992) (expert testimony may be based partially on information received from other sources if such facts and data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).

### (d)

As a final evidentiary matter, Kearse contends the court erred in refusing to admit the testimony of two of her witnesses, Dr. Sherman Blalock and Varner Richards.

Kearse proffered the testimony of Dr. Sherman Blalock, an orthopaedic surgeon, concerning his treatment of Payton from October 1986 through April 1988. Dr. Blalock treated Payton for a toe injury. Of particular note are Payton's continued complaints of pain during the period. Kearse argues the court erred in excluding the testimony because it was relevant to the issue of whether Payton was a "chronic slow healer."

Kearse presented the testimony of Dr. William Meeks, a neurosurgeon, concerning his treatment of Payton for toe pain and headaches from September 1986 through September 1990. Dr. Meeks described the medications he prescribed for Payton, including pain medication, over his course of treatment. He also testified he never could answer the question of the source of the toe pain except for a finding of stenosis in the back which could be irritating a nerve. Payton never complained to Dr. Meeks of dizziness or ringing in the ears. Given that Kearse presented the testimony of Dr. Meeks, who addressed the issue of continuing toe pain over the same period of time, Dr. Blalock's testimony was cumulative. Accordingly, the trial court did not err by excluding the testimony. *Weir v. Citicorp Nat'l Servs. Inc.*, 312 S.C. 511, 435 S.E. (2d) 864 (1993) (refusing to admit cumulative evidence is not prejudicial error).

Kearse also proffered the testimony of Varner ▮ Richards, a doctor of pharmacy. Richards was asked to review the medications taken by Payton to see if any of them had the potential to produce tinnitus as a side effect. He identified six drugs which were documented in medical literature as having an incident or adverse reaction of tinnitus. However, he could not state to a reasonable degree of certainty whether the medications caused the tinnitus noted by Payton. He could only state they had the "potential" to produce the reaction. The trial court refused to admit this testimony, apparently because Richards' testimony did not meet the "most probably" standard required when expert testimony is used to establish proximate cause. *See, e.g., Armstrong v. Weiland*, 267 S.C. 12, 225 S.E. (2d) 851 (1976). Kearse contends that Richards was qualified to testify as to the side effects of the drugs Payton was taking, and because his testimony was relevant to the issues involved in the case.

The potential side effects of the medications was relevant to the issues of causation and damages, *see, e.g., Crowley v. Spivey*, 285 S.C. 397, 329 S.E. (2d) 774 (1985) (evidence is relevant if it tends to establish or to make more or less probable some matter in issue upon which it directly or indirectly bears), and Richards was a proper witness to provide such information. To be competent as an expert, a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony. *Botelho v. Bycura*, 282 S.C. 578, 320 S.E. (2d) 59 (Ct. App. 1984). As a doctor of pharmacy, Richards was clearly qualified to give expert testimony as to the potential side effects of the drugs prescribed for Payton. Thus, to the extent that Richards would have testified in general about the potential side effects of the medications, the testimony should have been admitted. So long as Kearse was not attempting to prove that Payton's tinnitus in fact was caused by the mediations, the "most probably" standard was not applicable.[7]

---

[7] However, to the extent that Kearse did intend to use Richards to establish that the tinnitus was caused by Payton's medications, the trial court properly excluded the testimony. Richards himself testified that he was not qualified to diagnose a person's physical condition or the cause of a physical condition. He further testified that he could not testify to a reasonable degree of certainty that the medications caused Payton's tinnitus.

However, Kearse was not prejudiced by any error in excluding the testimony. Kearse established through cross-examination of Dr. Zwerling as well as Payton's neurologist that the medications Payton was taking could cause tinnitus as a side effect. Because Richards' testimony would have been cumulative, any error in excluding it does not warrant reversal. *Weir v. Citicorp Nat'l Servs.*

### III.

Kearse argues the court erred in charging the jury with respect to an additional complication suffered by Payton during a diagnostic procedure. Kearse contends that she should not be liable for damages attributable to the negligence of the doctor performing the procedure. We find no error.

As previously noted, Payton's neurologist referred him to a radiologist for a vertebral arteriogram to determine whether damaged arteries were causing Payton's continuing vertigo. Payton's femoral nerve was damaged during the procedure, resulting in pain and sensory loss in Payton's thigh. No evidence was introduced at trial which definitively established that the injury to Payton's thigh was the result of negligence on the part of the radiologist. However, even if the injury were the result of negligence, the intervening negligence of a third person will not excuse the original wrongdoer if such intervention ought to have been foreseen in the exercise of due care. *Graham v. Whitaker*, 282 S.C. 393, 321 S.E. (2d) 40 (1984). The negligence of an attending physician is reasonably foreseeable; thus, if an injured person uses ordinary care in selecting a physician for treatment of his injury, the law regards the aggravation of the injury resulting from the negligent act of the physician as part of the immediate and direct damages which naturally flow from the original injury. *Id.* Here, the treatment of Payton's original injury caused additional injuries. The trial court's instructions to the jury therefore were proper.

### IV.

Finally, Kearse contends the court erred in granting Payton's motion for directed verdict on liability because there was a jury issue as to Payton's contributory negligence. We disagree.

In ruling on a motion for directed verdict, the trial court is to view the evidence in the light most favorable to the nonmoving party and should deny the motion and submit the case to the jury if more than one reasonable inference can be drawn from the evidence. *Smith v. Wal-Mart Stores, Inc.,* 314 S.C. 248, 442 S.E. (2d) 606 (1994). We agree with the trial court's conclusion that only one reasonable inference can be drawn from the facts of this case. Kearse struck Payton from the rear. She admitted she was driving too fast and did not apply her brakes quickly enough to avoid striking Payton. There was no evidence which established that Payton was contributorily negligent. The trial court therefore properly refused to submit the issue of contributory negligence to the jury.

Accordingly, for the foregoing reasons, the decision of the trial court is hereby

Affirmed.

CONNOR, J., concurs.

CURETON, J., concurs in part and dissents in part in a separate opinion.

CURETON, Judge (concurring and dissenting):

I concur in all but part 1(c) of the majority opinion where it is concluded that payton's use of the term "redneck" to describe juror number eighteen and explain his reason for striking her does not constitute a *Batson* violation. Because I am of the opinion that the use of this racial stereotype evidences a subjective intent to discriminate and clearly violates the mandates of *Batson,* I must respectfully dissent. I further disagree with the majority's "dual motivation" analysis, and would hold instead that this patently racial explanation for striking juror number eighteen contaminated the entire jury selection process regardless of the genuineness of other explanations for the strike.[1]

This case is clearly controlled by *State v. Tomlin,* 299 S.C. 294, 384 S.E. (2d) 707 (1989). In *Tomlin,* the Supreme Court

---

[1] For a more detailed analysis of this issue see my concurring and dissenting opinion in *State v. Gill,* — S.C. —, 460 S.E. (2d) 412 (Ct. App. 1995) (Davis Adv. Sh. No. 16).

reversed a conviction where the prosecutor struck a juror because he "shucked and jived," ruling "the use of this racial stereotype is evidence of the prosecutor's subjective intent to discriminate and clearly violates the mandates of *Batson*." *Id.* 384 S.E. (2d) at 710. Although two of the three explanations offered for the strike were found to be racially neutral, the court nevertheless found a *Batson* violation because "shucked and jived" was a racial stereotype. In so holding, the majority implicitly found that a racially motivated reason coupled alongside a valid reason will vitiate the strike.

Accordingly, I would hold Payton violated *Batson*, and reverse in accordance with *Tomlin*.