0453

Timothy CROWLEY, As Administrator of the Estate of Michael Crowley, A Minor Under the Age of Fourteen (14) Years, Respondent, v. Edward F. SPIVEY and Nora D. Spivey, Appellants, and Timothy CROWLEY, As Administrator of the Estate of Timothy Crowley, Jr., A Minor Under the Age of Fourteen (14) Years, Respondent, v. Edward F. SPIVEY and Nora D. Spivey, Appellants.

(329 S. E. (2d) 774)

Court of Appeals

*T. Reeve Sams*, of *Levin, Sams & Davis*, Beaufort, *for appellants.*

*Joel D. Bailey*, of *Moss, Bailey, Dore & Jessee, P.A.*, Beaufort, *for respondent.*

Heard Aug. 1, 1984.

Decided April 29, 1985.

*Per Curiam:*

These two wrongful death actions were brought by Timothy Crowley (Timothy), as the administrator of the estates of his two minor sons, twelve-year-old Timothy, Jr., and five-year-old Michael. The suits were brought against the children's maternal grandparents, Edward F. and Nora D. Spivey. The cases were consolidated for trial, and the jury returned verdicts for actual damages in each suit. We affirm.

The decedents were the only children of the marriage between Timothy and Joyce Lynette Crowley (Lynette), who is the Spiveys' daughter. Lynette was granted custody of the children when she and Timothy were divorced in 1975. In 1978, Timothy gained custody from Lynette, who was granted visitation rights. On the morning of April 29, 1979, while the children were visiting Lynette for a weekend at the Spiveys' home in Beaufort, Lynette shot and killed the children. Lynette had received intermittent treatment for the mental disease paranoid schizophrenia since 1971.

The identical complaints alleged that Timothy, upon learning that Lynette had acquired a gun, advised the Spiveys that he would no longer permit visitation with the children away from his home. The Spiveys, it was alleged, then told Timothy they would supervise the care and safety of the children if the children came to visit Lynette at their home. Among the specifications of negligence charged were allegations that the Spiveys (1) unreasonably failed to discover that Lynette had access to or possession of a gun, (2) unreasonably failed to take measures to prevent Lynette from having access to a gun during the children's visitation, and (3) failed to exercise a reasonable degree of control and supervision over the visitation between Lynette and the children by allowing her to visit with the children in a locked room when the Spiveys knew or should have known that this would increase the likelihood of harm to the children.

I

We first address the Spiveys' contention that there is no competent evidence to support the verdict. In deciding this question, we are required to view the evidence and all the inferences reasonably deducible therefrom in the light most favorable to Timothy, the plaintiff. *Woodward v. Todd*, 270 S. C. 82, 240 S. E. (2d) 641 (1978). If the evidence as a whole is susceptible of more than one reasonable inference, the matter is for the jury to resolve. *Davenport v. Walker*, 280 S. C. 588, 313 S. E. (2d) 354 (S. C. App. 1984). Viewing the troubling facts of this case in such a light, they are as follows.

Lynette was first treated for a mental disorder in June

1971, when she was hospitalized for six weeks. Timothy testified that before the hospitalization Lynette displayed symptoms of "serious emotional problems," such as periods of severe depression, inordinate fears that people were "plotting" against her, and absurd delusions. During this time Lynette was in close contact with the Spiveys, who also noticed similar symptoms and, according to Timothy, were very much concerned.

The Spiveys kept abreast of Lynette's status throughout the 1971 hospitalization. Mr. Spivey helped Timothy escort Lynette to the hospital when she was first admitted, and was aware that she was diagnosed to be a paranoid schizophrenic. About two weeks into the six-week hospitalization period, Lynette was transferred to a different facility, in part because the Spiveys were not satisfied with the care received at the original facility.

Upon her discharge to the care of Timothy and the Spiveys, Lynette was prescribed a course of continued medication and follow-up care. With this treatment, her condition improved markedly. She was gradually taken off medication, but continued her follow-up treatment for the duration of her marriage.

When Lynette and Timothy were divorced in 1975, Lynette was granted custody of the children. In 1976, Lynette and the children moved from Charleston to Beaufort to live with the Spiveys.

In May 1977, Lynette began treatment as an outpatient at a Beaufort mental health clinic. She was again diagnosed to be a paranoid schizophrenic and was prescribed medication and periodic follow-up care. Her treatment at the Beaufort facility continued up to the tragic event of April 1979, but not on a regular basis.

In November 1977, Lynette decided to seek hospitalization. She traveled to a Charleston hospital and there was evaluated by Dr. Douglas Crane. Following the evaluation, however, she decided not to hospitalize herself. Thereafter, she telephoned Dr. Crane with great frequency. By April 1978, Dr. Crane had become so alarmed at Lynette's condition that he felt compelled to advise the Spiveys of his concern. Unable to reach the Spiveys by phone, Dr. Crane wrote them a letter informing them that Lynette had been telephoning

him on nearly a daily basis and that he thought Lynette's "demoralized and disorganized state" made "her potential for attempting to kill herself ... very high." Dr. Crane offered to assist the Spiveys in seeking psychiatric help for Lynette.

The Spiveys did not respond to Dr. Crane's letter, so about two weeks later, on his own initiative, he took steps to involuntarily commit Lynette, to include arranging to have her placed in the William S. Hall Institute in Columbia. With the commitment proceedings underway, the Spiveys traveled with Lynette to a Charleston hospital, where they spoke with Dr. Crane. They decided to escort Lynette from Charleston to the Hall Institute, with the involuntary commitment papers in hand. During the journey Lynette agreed to voluntarily commit herself.

Once at the Hall Institute, the Spiveys gave medical personnel an extensive history of Lynette. They related that her condition had deteriorated since January 1978. They noticed that Lynette had isolated herself and had become very suspicious, thinking people were plotting against her. They had even heard her speak of suicide.

Lynette remained in the Hall Institute from April 27, 1978, until June 9, 1978, when she was discharged to the Spiveys' care. Again she was prescribed medication and follow-up care at a mental health facility.

In July 1978, custody of the children was transferred to Timothy without contest from Lynette, who was given rights of visitation at her home on alternate weekends. The Spiveys noticed that Lynette became sad, depressed, and more withdrawn following the loss of custody. They began to suspect that she was not following her prescribed course of treatment, which they knew was necessary for her to lead a normal life. They never advised Timothy of these suspicions.

On December 30, 1978, Lynette purchased a .38 caliber revolver from a gun store in Beaufort for $124.80. Three days later she purchased a box of ammunition for $12.74.

In January 1979, Timothy learned from his son Michael that Lynette had a gun. He then informed Mr. Spivey that he would not permit the children to visit Lynette as long as she possessed a gun. Approximately four weeks later Lynette traveled to Timothy's home in Charleston to see the

children. When she arrived, she turned over to Timothy a pistol that fired only blank cartridges, assuring him that it was the gun she had bought. Timothy immediately telephoned Mr. Spivey to inquire about the type of gun Lynette had given him. Mr. Spivey told Timothy that the pistol Lynette had given him was not the gun she had purchased. He knew this because Mrs. Spivey had found a receipt from the Beaufort gun store showing the sale of the .38 caliber pistol for $124.80. Timothy then again told Mr. Spivey that Lynette could not visit the children as long as she had a gun.

After four to six weeks had passed without any visitation, Lynette and Mr. Spivey telephoned Timothy. Mr. Spivey informed Timothy that Lynette told him she had disposed of the gun, and that furthermore, he had been unable to find it after repeated searches. Mr. Spivey, in a plea to persuade Timothy to allow visitation, told him that he would take "full responsibility" and supervise the children's visits in Beaufort. Relying on that assurance, Timothy relented and allowed Lynette to resume visitation with the children, feeling that they would be safe under the Spiveys' care and supervision.

Lynette never explained to Mr. Spivey just how she had supposedly disposed of the gun. He stated that he believed her assurances that she no longer had it, but he mounted a "continuous" search for the weapon nevertheless. Mrs. Spivey joined him in the search, because, she testified, "[W]e wanted to make sure that [Lynette] could see the children and we could do it with peace of mind."

Mr. Spivey offered various explanations for the search. He indicated at one point that Lynette had always had access to his own pistol, so that his search for the gun that Lynette had purchased was simply "to try to fix it so that she could see the children." Elsewhere, however, he acknowledged that "there's a lot of difference in my gun being there [and] her having one taking it around all the time with her." Mr. Spivey secured his own gun from Lynette when Timothy informed him of his distress over Lynette having one herself, although Mr. Spivey stated that at the time he was surprised Timothy was so concerned about the matter.

Mr. Spivey also feared that the police might discover Lynette with a gun and that consequently Timothy might

try to prevent her from visiting the children altogether. An additional reason for the continued search was Mr. Spivey's concern for the children's safety; this concern, however, was not that Lynette would harm the children, but that the children would find the gun and harm themselves. Mr. and Mrs. Spivey both acknowledged that it was "common sense" that Lynette, or any person with a mental illness, should not carry a gun.

With the resumption of visitation, the Spiveys accompanied Lynette and the children whenever they traveled between Beaufort and Charleston incident to visitation. On the afternoon of Friday, April 27, 1979, however, Lynette arrived alone at Timothy's house to take the children to Beaufort. Timothy was at work, so his wife attempted to reach him by telephone to determine whether to release the children to Lynette. She was unable to make contact with him, and eventually allowed Lynette to leave for Beaufort with the children. When Lynette arrived at the Spiveys' house in Beaufort, she telephoned Timothy to tell him that she and the children had safely made the journey.

Two days later, on Sunday morning, April 29, 1979, at about seven o'clock, Mr. and Mrs. Spivey were awakened by a "cracking sound." About three or four minutes later, they heard a second cracking sound. Mr. Spivey decided to investigate. He went to the children's bedroom, found it locked, and asked, "Is everything alright?" It was Lynette who responded with, "Yes," so Mr. Spivey returned to bed. Although Lynette and the children had separate bedrooms, Mr. Spivey testified that occasionally they slept together and that Lynette always locked her door.

The Spiveys discovered the children at about 8:30 a.m. when they went to see why they were not yet up and about. When a police officer arrived at 8:36 a.m., Timothy, Jr., was dead. Michael had a faint pulse, but he died before he could be transported from the scene. Both died from wounds to the head inflicted by the gun that Lynette had purchased the previous December. Four spent shell casings were found in the bedroom.

Afterwards Mr. Spivey told the police that he believed Lynette had stopped taking medication and had not been to therapy in the preceding two to three weeks. Mr. Spivey also

told the police that he knew Lynette had a gun but that he did not know its whereabouts.

We reiterate that these facts are drawn with a view of the evidence taken in the light most favorable to the plaintiff, Timothy. While evidentiary conflicts are numerous, from the evidence presented the jury could have found the facts to be as stated.

To recover in negligence, the plaintiff must show (1) a duty of care owed by the defendant, (2) a breach of that duty by negligent act or omission, and (3) damage proximately resulting therefrom. *Brown v. South Carolina Insurance Company*, S. C., 324 S. E. (2d) 641 (S. C. App. 1984). The Spiveys seek reversal of the verdict on the asserted absence of a duty of care. Alternatively, they contend that even if there was such a duty their conduct was not the proximate cause of the injury.

The duty of care in this case is grounded in the legal proposition that one who assumes to act, even though under no obligation to do so, may become subject to the duty to act with due care. *Roundtree Villas Association, Inc. v. 4701 Kings Corporation*, 282 S. C. 415, 321 S. E. (2d) 46, 51 (1984) (citing Restatement [Second] of Torts, § 323); *Carolina Bank and Trust Company v. St. Paul Fire and Marine Co.*, 279 S. C. 576, 310 S. E. (2d) 163 (S. C. App. 1983); *see also Glanzer v. Shepard*, 233 N. Y. 236, 135 N. E. 275 (1922). Timothy's testimony is unequivocal that he allowed visitation to resume because the Spiveys undertook to provide supervision over the children's visits with Lynette in Beaufort. The evidence also warrants the conclusion that Timothy was swayed to permit visitation because the Spiveys undertook a search for the pistol and were satisfied that Lynette no longer had it. Although the Spiveys were not obligated to so act, once their performance began, a common law duty to exercise reasonable care arose. *Roundtree Villas Association, Inc. v. 4701 Kings Corporation*, supra; W. Prosser, *Law of Torts*, § 56 at 346 (4th ed. 1971) ("Where performance clearly has been begun, there is no doubt that there is a duty of care.") .

On the Spiveys' alternative contention that their conduct was not the proximate cause of the injury, they claim that they are insulated from liability for their conduct because

the intervening independent act of Lynette was not reasonably foreseeable. Stated another way, they contend there was no evidence from which the jury could conclude that they could have reasonably foreseen that Lynette would harm the children as a natural and probable consequence of their negligence.

The controlling principles of law regarding intervening acts of a third party were stated in *Stone v. Bethea*, 251 S. C. 157, 161, 161 S. E. (2d) 171, 173 (1968) (citations omitted):

> Foreseeability of some injury from an act or omission is a prerequisite to its being a proximate cause of the injury for which recovery is sought. The test, therefore, by which the negligent conduct of the original wrongdoer is to be insulated as a matter of law by the independent ... act of another, is whether the intervening act and the injury resulting therefrom are of such character that the author of the primary negligence should have reasonably foreseen and anticipated them in the light of the attendant circumstances. The law requires only reasonable foresight, and when the injury complained of is not reasonably foreseeable in the exercise of due care, there is no liability.

The matter is also aptly addressed in *Green v. Atlanta & Charlotte Air Line Railway Co.*, 131 S. C. 124, 133, 126 S. E. 441, 444 (1925):

> The proposition that the wrongful or illegal act of an independent third person may not be regarded as such a consequence of a tort-feasor's alleged wrong as should entail legal liability must rest ... upon the assumption that such a consequence is not one of which a person who assumes the discharge of the ordinary civil obligation has knowledge or the opportunity by the exercise of reasonable diligence to acquire knowledge; that it is an unnatural and abnormal intervention in the ordinary train of events and consequences not reasonably to be anticipated from the act or omission which is charged to the alleged tort-feasor as a breach of duty.

The Spiveys emphasize that Lynette had no history of violent behavior and exhibited no manifestation of ill will towards the children, whom from all indications she loved dearly. This does not conclusively show, however, that the Spiveys could not have reasonably foreseen that the children would be at risk, while with Lynette when she was armed with a pistol during a period when she was deviating from a prescribed course of treatment that was necessary for her to lead a normal life.

Evidence showed the Spiveys knew Lynette had a serious mental health problem from the time she was first hospitalized in 1971. In the years that Lynette lived with the Spiveys immediately preceding the tragedy, it is inferable that they were as well acquainted as anyone with her mental disposition and the effect the failure to take her prescribed medication would have on her. Their knowledge of Lynette's condition is reflected in their testimony that as a matter of common sense Lynette should not possess a pistol. This belies the assertion that the Spiveys could not reasonably apprehend danger to others if Lynette were in possession of a pistol, a matter that is underscored by expert testimony that the danger to others is increased when a paranoid schizophrenic comes into possession of a weapon that can be used with great immediacy, such as a pistol.

Moreover, the obvious goal of Timothy's express prohibition on visitation was to protect the children. It would require no quantum leap of logic for the jury, in recognition of this fact, to infer that the Spiveys also could reasonably foresee that Lynette would pose a threat to the children if left alone with them while in possession of a pistol. Indeed, Mrs. Spivey's testimony that she and her husband searched for the pistol so that they would have "peace of mind" when the children visited could be interpreted as a recognition that potential harm to the children as a result of Lynette's having the pistol was not only foreseeable but also actually foreseen. *Cf. Accordini v. Security Central, Inc.*, S. C., 320 S. E. (2d) 713 (S. C. App. 1984) (that a theft may occur if burglar alarm fails is not only foreseeable but foreseen as well).

Further, it is not necessary that the Spiveys should have foreseen the particular act which occurred, but rather only

that the injury was a natural and probable consequence of their negligence. Our Supreme Court many times has stated the applicable rule:

> [T]o establish liability it is not necessary that the person charged with negligence should have contemplated the particular event which occurred.... He may be held liable for anything which appears to have been a natural and probable consequence of his negligence. If the actor's conduct is a substantial factor in the harm to another, the fact that he neither foresaw nor should have foreseen the extent of harm or the manner in which it occurred does not negative his liability.

*Childers v. Gas Lines, Inc.*, 248 S. C. 316, 325, 149 S. E. (2d) 761, 765 (1966) (citations omitted). *See also McQuillen v. Dobbs*, 262 S. C. 386, 393, 204 S. E. (2d) 732, 735-36 (1974); *Brown v. National Oil Co.*, 233 S. C. 345, 352-53, 105 S. E. (2d) 81, 84-85 (1958); *Hicklin v. Jeff Hunt Machinery Co.*, 226 S. C. 484, 493, 85 S. E. (2d) 739, 743 (1955); *Culbertson v. Johnson Motor Lines, Inc.*, 226 S. C. 13, 22, 83 S. E. (2d) 338, 342 (1954); *Tobias v. Carolina Power & Light Co.*, 190 S. C. 181, 186-187, 2 S. E. (2d) 686, 688 (1939). Thus the assertion that the Spiveys could not foresee the extent of the harm or the manner in which it occurred cannot shelter them from liability.

We conclude that there is sufficient evidence from which the jury could infer that the Spiveys could reasonably foresee that some harm would come to the children if they unreasonably failed to find the pistol and failed to take reasonable measures to monitor Lynette's contact with the children. Thus, the issue of proximate cause was for the jury to resolve. *Davenport v. Walker*, 280 S. C. 588, 313 S. E. (2d) 354 (S. C. App. 1984).

## II

We next address the Spiveys' allegations of error regarding numerous evidentiary rulings.

Admitted into evidence over objection were Lynette's medical records from the Charleston County Hospital, the Medical University of South Carolina, the William S. Hall Institute, and the Coastal Empire Mental Health Center.

These records documented Lynette's medical care from her first hospitalization in 1971 through April 1979. They generally contain factual observations made by medical personnel concerning Lynette based upon her general behavior and remarks. There was no showing that the Spiveys had actual knowledge of their contents. The Spiveys attack the admission of the records on relevancy and hearsay grounds.

Evidence meets the test of relevance if it "tends to establish or to make more or less probable some matter in issue upon which it directly or indirectly bears." *South Carolina Department of Social Services v. Bacot*, 280 S. C. 485, 488, 313 S. E. (2d) 45, 47 (S. C. App. 1984). The trial judge has a large discretion in the determination of the relevancy of evidence, and his decision to either admit or reject evidence will not be disturbed on appeal unless there is an abuse of such discretion amounting to an error of law to the prejudice of the appellant's rights. *Merrill v. Barton*, 250 S. C. 193, 156 S. E. (2d) 862 (1967).

The trial judge here determined that even though the Spiveys did not have actual knowledge of the records' contents, the records nonetheless tended to establish that the Spiveys knew or should have known the nature of Lynette's illness. This was a matter in issue because throughout the trial the Spiveys adamantly denied any forewarning that Lynette could cause harm to come to the children. The burden was thus upon Timothy as the plaintiff to show that the nature and extent of Lynette's illness should have been apparent to the Spiveys, with whom Lynette had either lived or maintained contact since the onset of her illness.

We find that the trial judge acted within his discretion in permitting Timothy to attempt to meet this difficult burden by introducing the medical records. The records showed that Lynette's illness was manifest in some degree to other persons, and thus they had some probative value in showing that the nature and extent of the illness were also apparent to the Spiveys. *Parsons v. Smithey*, 109 Ariz. 49, 504 P. (2d) 1272 (1973) (opinions and conclusions of psychiatrists contained in records admissible to show that laypersons who had daily contact with a third person knew or should have known of the third person's mental disposition); *cf. Howell*

*v. Hairston*, 261 S. C. 292, 199 S. E. (2d) 766 (1973) (defendants' knowledge of child's disposition may be shown by evidence of others' perceptions of child's dispostion, as well as by evidence of defendants' first-hand knowledge). In the absence of a stringent rule permitting the admission of only that evidence which shows a person has first-hand knowledge of another's mental disposition, we cannot say the trial judge committed an abuse of discretion amounting to an error of law in admitting the medical records for their probative value on the issue of the Spiveys' knowledge.

Considering next the Spiveys' contention that the records were inadmissible because they were hearsay, we note that most portions of the records were admissible over such an objection under the Business Records as Evidence Act. Section 19-5-510, Code of Laws of South Carolina, 1976, as amended. Some portions of the records, however, contain subjective opinions or judgments, which generally are not admissible under the Act. *Kershaw County Department of Social Services v. McCaskill*, 276 S. C. 360, 278 S. E. (2d) 771 (1981); *State v. Key*, 277 S. C. 214, 284 S. E. (2d) 781 (1981). Although these portions of the records would have been properly excluded, we discern no prejudice to the Spiveys from their admission. The import of the opinions and conclusions in the records is that Lynette was afflicted with paranoid schizophrenia. This was abundantly established by other competent evidence, and further, was not truly a matter in dispute at trial. Under these circumstances the admission of this evidence is not reversible error. *State ex rel. McLeod v. C & L Corporation, Inc.*, 280 S. C. 519, 313 S. E. (2d) 334 (S. C. App. 1984); *Carolina National Bank of Columbia v. City of Greenville*, 97 S. C. 291, 81 S. E. 634 (1914).

The Spiveys also raise exceptions to the testimony of three psychiatrists who treated Lynette in the years before April 1979. Their arguments in support of these exceptions all assert that the psychiatrists should not have been permitted to testify as to their conversations with Lynette or to their resulting impressions and opinions. The Spiveys contend the trial judge should have excluded testimony regarding Lynette's statements to the psychiatrists as hearsay. They argue further that the psychiatrists' impressions and opinions

were irrelevant in that there was no showing that they knew or should have known of those matters.

Lynette's statements to her psychiatrists regarding her condition were admissible over an objection that they are hearsay. Our Supreme Court has ruled that a patient's statements to a physician consulted for treatment are generally admissible as evidence of the facts stated. *Gentry v. Watkins-Carolina Trucking Company*, 249 S. C. 316, 154 S. E. (2d) 112 (1967); see similarly Rule 803(4) of the Federal Rules of Evidence. We find also that the psychiatrists' impressions, conclusions and diagnoses of Lynette were relevant in the same way the medical records discussed above were relevant. They had some probative value in showing that the nature and extent of Lynette's illness should have been apparent to the Spiveys. *Parsons v. Smithey, supra.* We find no abuse of discretion amounting to legal error in allowing the psychiatrists to testify about their treatment of Lynette.

The Spiveys also complain that the trial judge erred in admitting into evidence a chart, prepared for use at trial, that summarized 31 pages of telephone company records of the Spiveys' telephone account. The telephone company records themselves had been previously admitted into evidence. The chart objected to showed that 132 long distance telephone calls were made to the office of Dr. Douglas Crane in Charleston, and were either made from or charged to the Spiveys' telephone number from December 1977 to October 1978, when the Spiveys disconnected their phone. There is no contention that either the underlying telephone records or the information on the chart are inaccurate. The only objection to the chart was that it served to buttress and repeat testimony already given. The trial judge ruled the chart admissible because it would save the jury from having to decipher for themselves the long and somewhat confusing telephone records. We find no abuse of discretion in the admission of the chart. A summary of voluminous records prepared for use at trial is admissible if the records themselves are properly in evidence. *Butler v. Sea Pines Plantation Company*, 282 S. C. 113, 317 S. E. (2d) 464 (S. C. App. 1984).

The Spiveys' final exception to the trial judge's evidentiary rulings concerns the testimony of a witness who supervised Lynette when she was employed as a receptionist in a law office from December 1977 to February 1978. The witness, an office manager, was allowed to testify that during Lynette's short employment she displayed irrational behavior and was fired as a result. The Spiveys objected on the ground that the witness was not qualified to render an opinion that a person's conduct was or was not irrational.

Again, we find no abuse of discretion in the admission of this testimony. A layperson may testify as to his impression of another person's conduct, demeanor, manner of speech, or appearance as being rational or irrational. *Shelton v. Southern Railway Co.*, 86 S. C. 98, 67 S. E. 899 (1910); 32 C. J. S. *Evidence* § 546(31) (1964).

### III

The Spiveys assign error in the trial judge's denial of their motion, made the day trial began, to amend their answers to assert the defense of contributory negligence. They except also to the court's refusal to allow the same amendment at the conclusion of the reception of the evidence. The asserted basis of the defense was that Timothy was aware of Lynette's possession of the gun but permitted the children to visit her nonetheless.[1] Without deciding whether this constitutes evidence of contributory negligence by Timothy, we find the trial judge acted within his discretion in denying the motion.

The Spiveys were first served with summonses and complaints in June 1980, to which they filed answers in the form of qualified general denials. In the next sixteen months Timothy twice amended his complaints, and the Spiveys duly filed answers. On neither occasion did they plead any affirmative defenses.

---

[1] In a wrongful death action, the contributory negligence of the beneficiary will bar recovery at least so far as that beneficiary is concerned. *Butler v. Temples*, 227 S. C. 496, 88 S. E. (2d) 586 (1955); *Wilson v. Clarendon County*, 139 S. C. 333, 138 S. E. 33 (1927).

On November 2, 1981, the first day of trial but before the jury was empanelled, the Spiveys made their motion to amend their answers. In support of the motion, defense counsel asserted that the deposition of Timothy's wife, Ruth Crowley, which he had taken only three days earlier, revealed for the first time the evidence that Timothy was contributorily negligent. In denying the motion, the trial judge indicated that the defense was suggested by the allegations of the original complaints and therefore could have been set up when the Spiveys first filed answers. He concluded the making of the motion on the first day of trial came too late.

A motion to amend pleadings, in furtherance of justice, under Section 15-13-920, Code of Laws of South Carolina (1976), is addressed to the sound discretion of the trial judge, whose decision will not be disturbed unless there is shown an abuse of discretion. *Anders v. Nash*, 256 S. C. 102, 180 S. E. (2d) 878 (1971). While amendments to pleadings are favored and liberally allowed, circumstances such as inexcusable delay, surprise to the adverse party, or the like, may justify refusal to amend. *Braudie v. Richland County*, 217 S. C. 57, 59 S. E. (2d) 548 (1950).

An examination of the original complaints and the Spiveys' deposition shows that their asserted factual basis for the defense of contributory negligence was known to them well before the time they took Ruth Crowley's deposition. This is a reasonable basis for the conclusion that there was inexcusable delay in attempting to amend the answers on the first day of trial. Accordingly, we cannot say the trial judge abused his discretion in denying the motions to amend, both before the jury was empanelled and after the receipt of evidence. *Alamance Industries v. Chesterfield Hosiery Mill*, 239 S. C. 287, 122 S. E. (2d) 648 (1961) (no abuse of discretion to deny request to amend answer five days before trial where defendant was aware of the factual matter that was the subject of the proposed amendment from the time the suit was commenced eight months earlier).

## IV

The Spiveys assert error by the trial judge in the denial of their motion to strike the following paragraph from both complaints:

That, the Defendants, when notified by the Plaintiff of the termination of the visitation privileges with the said minor children, stated to the Plaintiff that they would supervise the care and safety of such children if the Plaintiff would permit the children to visit the said Joyce Lynette Crowley in the home of the Defendants.

The Spiveys interpret this paragraph to allege that a contract existed between themselves and Timothy. They urge the conclusion that such an allegation is immaterial and prejudicial in a negligence action, because the jury could infer that their duties arose from the contract rather than by operation of law under ordinary rules of negligence. We reject this argument. We do not construe the paragraph to allege a contractual relationship between the parties, but merely to set forth the circumstances under which the Spiveys undertook to supervise the children's visitation with Lynette. But even if the existence of a "contract" were pleaded, the allegation would be material to the cause of action, which is plainly in tort. The existence of a contract would be relevant to show the creation of a relationship between the parties through which duties arose by operation of law, irrespective of the duties imposed by the contract. *See Brown v. South Carolina Insurance Company*, S. C., 324 S. E. (2d) 641 (S. C. App. 1984), quoting *Meddin v. Southern Railway-Carolina Division*, 218 S. C. 155, 165, 62 S. E. (2d) 109, 112 (1950). The trial judge properly denied the motion to strike this paragraph. *Poole v. Combined Utility System of the City of Easley*, 269 S. C. 271, 237 S. E. (2d) 82 (1977).

The Spiveys pose a similar argument in support of their contention that the trial judge erred in refusing to strike another portion of the complaint. The part objected to alleged that the Spiveys were negligent "[i]n failing to insure that the visitation privileges exercised by the said Joyce Lynette Crowley with the said minor children were conducted in an environment subject to their direct supervision and control."

The Spiveys contend that because of the presence of the word "insure," this portion of the complaint alleges that they were the guarantors of the children's safety, a higher duty than the duty of due care imposed under traditional negligence principles. However, we do not so construe this allegation. It is nothing more than a specification of negligence that the Spiveys were careless in allowing Lynette to be with the children outside their presence. It was for the jury to determine whether this was the fact upon the testimony given. The trial judge properly denied the motion to strike this allegation. *Simmons v. Western Union Telegraph Co.*, 63 S. C. 425, 41 S. E. 521 (1902).

## V

By their final exception the Spiveys contend that the following portion of the charge to the jury was inapplicable to the issues raised by the pleadings and evidence:

[C]hildren of tender years and youthful persons generally are entitled to care proportioned to their inability to foresee and avoid the perils that they may encounter, as well as to the superior knowledge of persons who come into contact with them.

We find the trial judge did not err in giving this instruction. It is inferable that the children, because of their youth, were not acquainted with the extent of their mother's illness, and could not be expected to know of the attendant dangers should she come in possession of a pistol. Thus, based upon the proposition of law stated in the charge, the jury could decide that the Spiveys, in the exercise of reasonable care, should have taken precautions that the children could not have been expected to take themselves. Because the instruction concerned an issue raised by the pleadings and evidence, there was no error in charging it to the jury. *Baker v. Weaver*, 279 S. C. 479, 309 S. E. (2d) 770 (S. C. App. 1983).

For these reasons, the judgment of the trial court is

Affirmed.